# United States Court of Appeals
## For the First Circuit

No. 16-1492

MARK W. EVES,

Plaintiff, Appellant,

v.

PAUL R. LEPAGE,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Stahl, and Thompson,
Circuit Judges.

David G. Webbert, with whom Carol J. Garvan and Johnson, Webbert & Young, LLP were on brief, for appellant.
Patrick Strawbridge, with whom Bryan K. Weir and Consovoy McCarthy Park PLLC were on brief, for appellee.

November 22, 2016

**LYNCH**, **Circuit Judge**.   Paul LePage, the Republican Governor of Maine, has had deep political disagreements with members of the Maine Legislature, particularly those who are Democrats -- including the Speaker of the House, plaintiff Mark Eves.   The Speaker, who is term-limited, obtained a contract of employment with Good Will-Hinckley ("GWH"), a Maine nonprofit that operates the MeANS charter school for at-risk children, which is largely funded by biennial grants from the state.   Whether to disburse that grant money to GWH was left by the legislature to the discretion of the governor.

Governor LePage conveyed to GWH his displeasure at the organization's decision to hire the Speaker and threatened to withhold GWH's discretionary funding when payment would ordinarily be due, assuming passage of Maine's budget for Fiscal Years ("FY") 2016 and 2017.   Faced with the prospect of losing funding on which it depended, GWH terminated the Speaker's employment contract.

The Speaker sued the Governor in federal court for damages and injunctive relief, asserting that the Governor, in violation of the U.S. Constitution, had retaliated against the Speaker's exercise of his First Amendment rights.   The Speaker also sought relief under state tort law.   The U.S. District Court for the District of Maine dismissed all claims.   Eves v. LePage, No. 1:15-cv-300-GZS, 2016 WL 1948869 (D. Me. May 3, 2016).

We affirm dismissal with prejudice of the Speaker's federal claims, on qualified immunity grounds.  As for his state claim, we vacate, and direct the district court to dismiss it without prejudice.

I.

## Background

The issues in this case are ultimately issues of law, which receive de novo review.  See United States v. Baird, 712 F.3d 623, 628 (1st Cir. 2013).  Like the district court, we "assume[] the truth of the complaint's well-pleaded facts and draw[] all reasonable inferences in [Speaker Eves's] favor." Eves, 2016 WL 1948869, at *1 (citing Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012)).

A.   Maine's Government and Budget Process

We begin with background information that is helpful in understanding the issues in this case.

Serving in the Maine Legislature is not a full-time job for most representatives.  The legislature typically sits twice during each two-year session: once from December to June in year one, and then again from January to April in year two.  See Me. Rev. Stat. Ann. ("M.R.S.A.") tit. 3, § 2.  A legislator's salary is $24,056, spread across the two years, plus a $38 per diem, when the legislature is active, "for housing or mileage and tolls." Eves, 2016 WL 1948869, at *2.  Most legislators have at least one

- 3 -

other source of income, often in the private sector. Id. In fact, legislators from both parties agree that "[n]early all legislators depend on a career outside of the State House to provide for their families." Id. at *5 (relaying statement by Maine Senate President Mike Thibodeau, a Republican).

Maine's biennial budget process starts when the Department of Administrative and Financial Services, after considering submissions from various agencies and policy committees, "prepare[s] and submit[s] . . . a state budget document" to the governor. M.R.S.A. tit. 5, § 1662. The governor reviews the draft budget, alters it, and then sends it to the legislature before the statutory deadline "in January of the first regular legislative session." Id. § 1666. The legislature must "enact a budget no later than 30 days prior to the date of adjournment prescribed" by law. Id. § 1666-A. The legislature's budget then returns to the governor, who has line-item veto power, permitting him to reduce "any dollar amount" in the budget. Me. Const. art. IV, pt. 3, § 2-A. The legislature can override any line-item veto with a simple majority of both the House and the Senate. Id. The governor can also veto the entire budget, like any other piece of legislation, in which case a 2/3 majority of both the House and the Senate is necessary to override the veto. Id. art. IV, pt. 3, § 2.

The facts of this case, which occurred mostly in June 2015, arose in the midst of the biennial budget process and involved serious political conflict between Governor LePage and the legislature. In a press conference on May 29, 2015, the Governor stated that he planned to veto "every bill sponsored by a Democrat" for the rest of his term in office "unless the Legislature agreed to support his plan to have a referendum vote on eliminating Maine's income tax." Eves, 2016 WL 1948869, at *4. The Governor did, in fact, veto ten bills on June 8, 2015, stating that he had done so purely because of their Democratic sponsorship. After the legislature passed a budget on June 17, 2015, the Governor issued sixty-four line-item vetoes, each of which the legislature overrode on June 18 and 19, 2015.

On June 29, 2015, the Governor vetoed the entire budget. The legislature also overrode that veto, on June 30, and enacted the budget for FY2016 and FY2017 into law. That budget included discretionary funding for GWH.

B.  Good Will-Hinckley and Speaker Eves

GWH is a private nonprofit organization, located in Fairfield, Maine, which aims to provide services to at-risk children throughout the state. Founded in 1889 as a "farm, school and home for needy boys," GWH now has a broader mission and portfolio encompassing a "college step-up program," a "Learning Center for youth with emotional or behavioral challenges," a

- 5 -

nutrition program, a library, and a museum.  Id. at *2.  The organization has long depended on both private donations and government grants.

Since 2009, GWH has been designated by Maine "to serve as the nonprofit charitable corporation with a public purpose to implement the Center of Excellence for At-risk Students." Id. at *3; see M.R.S.A. tit. 20-A, § 6951.  Fulfilling this responsibility, GWH opened a charter school in 2012, called the Maine Academy of Natural Sciences ("MeANS").  MeANS has its own board and its own principal; it also relies in large part on discretionary state funding.

The Maine state budget for FY2014 and FY2015 -- which covered the period from July 1, 2013 to June 30, 2015 -- allocated $1,060,000 in discretionary funding to GWH for the purpose of operating MeANS.  In that period of time, the LePage Administration chose to disburse all of that money.  The proposed budget for FY2016 and FY2017, under debate in spring 2015, contained an identical appropriation of $1,060,000, to be paid to GWH in quarterly installments, as in previous years.

Glenn Cummings, formerly a Speaker of the Maine House of Representatives, resigned as president of GWH in September 2014, having served for approximately four years.  GWH began searching for a successor, and plaintiff Mark Eves was one of nineteen applicants.  Eves, Maine's current Speaker, has served in that

role since 2012 and as a representative since 2008. Because he is term-limited, see M.R.S.A. tit. 21-A, § 553(2), he must leave the House entirely in December 2016, when his fourth term expires. Speaker Eves also has fifteen years of professional experience as a marriage and family therapist. Since moving from California to Maine in 2003, the Speaker has worked in that field, even while serving in the legislature.

GWH's eight-member search committee interviewed Speaker Eves on April 24, 2015. He visited the campus as one of three finalists, and on April 30, the GWH Senior Leadership Team unanimously recommended him as the best of the three. The Team's memo "cited his 'extensive clinical experience,' his 'balance of executive administration and fundraising experience,' and his 'leadership style and polished approach' as reasons for their conclusion." Eves, 2016 WL 1948869, at *3. After Speaker Eves interviewed with the full boards of GWH and MeANS on May 15, both voted unanimously to offer him the job of GWH President.

On June 5, 2015, Speaker Eves and GWH entered into a two-year employment agreement, which contained a "for-cause termination provision" and "no conditions or contingencies" related to any actions or funding decisions by the State. Id. at *4. GWH announced the Speaker as its new President on June 9.

C.   Governor LePage's Intervention

On June 5, 2015, Governor LePage learned that GWH had decided to hire Speaker Eves.  The Governor promptly called GWH's Interim President, stating "that he was extremely upset" about the news and "us[ing] profanity to describe [Speaker Eves] and his work."  Id.   That same day or "soon after," LePage sent a handwritten note to GWH's Board Chair, which "referred very negatively to Eves" and called the Speaker a "hack."  Id.  The Board Chair's belief, after reading the note, was "that GWH would lose $1,060,000 in state funding if it retained Eves as its new President."  Id.

On June 8, Governor LePage sent a public letter to the Board Chairs of GWH and MeANS, "urging that they reconsider."  Id. The letter characterized Speaker Eves as "a longtime opponent of public charter schools" who had fought against "every effort to reform Maine's government."  Id.  The GWH Board, "which includes people of various political affiliations," discussed the letter and "agreed that their selection of Speaker Eves [had been] well-supported and . . . not based on political considerations."  Id.

Also on June 8, the Governor received a call from Gregory Powell, the Board Chair of the Harold Alfond Foundation ("the Foundation"), who was responding to a June 5 voicemail from the Governor.  During their conversation, Powell learned that the Governor was "withdrawing all support, including financial

- 8 -

support, from GWH as long as Eves remained as President of the organization." Id. Responding to that news, Powell sent a letter to GWH's Board on June 18, warning them that the Foundation had "serious concern[s] . . . regarding [GWH's] future financial viability" if the Governor were to follow through on his threat to withhold the $1,060,000 of state funding. Id. Those concerns, he further warned, made the Foundation uneasy about committing to a $2,750,000 grant that the Foundation had been planning to give to GWH.

On or about June 9, Governor LePage told the Acting Commissioner of the Department of Education not to send any more payments to GWH that were not required by law. The Commissioner duly froze $132,500 in discretionary funds scheduled to be sent to GWH for the next quarter (beginning on July 1). At that point, having passed no new budget, the legislature had not yet appropriated any quarterly payments for GWH beyond what GWH had already received.

The lawyers representing Speaker Eves and Governor LePage, respectively, conferred on June 22. The Speaker's lawyer asked the Governor to withdraw his threats, but the Governor refused to change his stance. He also took no further steps "to reduce or eliminate the $1,060,000 in discretionary funds allotted in the proposed state budget for GWH." Id. at *5.

- 9 -

After that conversation between the attorneys, GWH terminated Speaker Eves's employment contract on June 24, one week before his planned July 1 start date. The Speaker immediately stated publicly that "his firing was caused by LePage's threat to withhold funding." Id. Several GWH leaders emailed Speaker Eves, opining that he "would have been a wonderful fit" for the organization. Id. Months later, on October 15, GWH's Board Chair stated in a legislative hearing that Eves would not have been fired but for Governor LePage's intervention. Some of the Speaker's colleagues in the legislature also spoke out. State Senate President Mike Thibodeau, a Republican, publicly called himself "very saddened by this situation and shocked by what is being alleged. Nearly all legislators depend on a career outside of the State House to provide for their families." Id.

Initially, Governor LePage declined to confirm or deny any interference with GWH's decision-making process. However, on June 29, local reporters interviewed the Governor and asked whether he had "threatened to withhold money" from GWH, and he responded:

> Yeah, I did! If I could, I would! Absolutely; why wouldn't I? Tell me why I wouldn't take the taxpayer money, to prevent somebody to go into a school and destroy it. Because his heart's not into doing the right thing for Maine people.

In a radio address on July 7, the Governor further explained:

> [The Speaker] worked his entire political career to oppose and threaten charter schools in Maine. He is the mouthpiece for the Maine Education Association. Giving

taxpayers' money to a person who has fought so hard against charter schools would be unconscionable.

. . . [F]ormer legislators used their political positions to land cushy, high-paying jobs in which they were trusted to use taxpayer money to improve the lives of Mainers. They abused that trust and had to face the consequences of their actions. The same is true of Mark Eves.

And in another interview, on July 30, the Governor called Speaker Eves "a plant by the unions to destroy charter schools." The Governor drew an analogy: "One time I stepped in . . . when a man was beating his wife. . . . Should I have stepped in? Legally, no. But I did. And I'm not embarrassed about doing it."

D. U.S. District Court Proceedings

Speaker Eves filed this lawsuit on July 30, 2015 and then filed a First Amended Complaint on December 18, 2015. Governor LePage moved to dismiss on January 5, 2016, arguing that the complaint failed to state a claim, see Fed. R. Civ. P. 12(b)(6), and that the subject matter of the lawsuit was "a political dispute that does not belong in court." On April 13, 2016, the day of oral argument on the Governor's 12(b)(6) motion, the Speaker was granted leave (without opposition) to file a Second Amended Complaint.

The Second Amended Complaint contained five claims against Governor LePage: four federal law claims under 42 U.S.C. § 1983 for violations of Speaker Eves's rights to political affiliation, free speech, freedom of association, and procedural

- 11 -

due process, as well as a fifth claim under state law for intentional interference with contract. As relief, the Speaker requested (1) a declaratory judgment; (2) an injunction compelling Governor LePage to "permanently withdraw his illegal threat" to GWH and "cease using his authority to illegally retaliate against Eves or private organizations that are prospective employers or employers of Eves"; and (3) damages.

On May 3, 2016, the district court issued an opinion, which granted Governor LePage's motion to dismiss. Eves, 2016 WL 1948869, at *1. The court entered judgment for the Governor the next day, and Speaker Eves filed a notice of appeal that same day.

II.

**Damages Claims**

Speaker Eves continues to seek damages under § 1983, for alleged violations of his First Amendment rights of political affiliation and freedom of association, as well as injunctive relief.[1] Governor LePage argues in response that either absolute or qualified immunity shields him from any personal liability for damages under § 1983, and that there is no legal basis for injunctive relief.

_____

[1] On appeal, Speaker Eves has abandoned his § 1983 damages claims arising from free speech and due process violations. He continues to press those alleged violations in his pursuit of equitable relief.

The facts and the parties' arguments touch upon a host of nuanced First Amendment questions. We leave them for another day and affirm dismissal of the damages claims on narrow grounds: Governor LePage is entitled to qualified immunity, because Speaker Eves has not shown that it was beyond debate that the Governor's discretionary actions amounted to unconstitutional retaliation against the Speaker.[2] See Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).

A. Qualified Immunity Framework

Qualified immunity analysis, which forecloses Speaker Eves's damages claims, encompasses two inquiries. The first is "whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right," and the second is "whether the right was 'clearly established' at the time of the defendant's

---

[2] Because we affirm the district court's judgment on these qualified immunity grounds, we express no view on whether Governor LePage could reasonably have believed that his own First Amendment rights and the government speech doctrine protected these communications from suit. See Eves, 2016 WL 1948869, at *13-15; see also Walker v. Texas Div., Sons of Confederate Veterans, Inc., 135 S. Ct. 2239 (2015); Pleasant Grove City v. Summum, 555 U.S. 460 (2009). We also do not reach the Governor's absolute immunity defense, or the question of whether Speaker Eves's position as President of GWH, an organization receiving state funding and overseeing Maine's first public charter school, made him a "policymaker" who could be terminated without offending the First Amendment. See, e.g., O'Connell v. Marrero-Recio, 724 F.3d 117, 126 (1st Cir. 2013); Prisma Zona Exploratoria de P.R., Inc. v. Calderon, 310 F.3d 1, 7-8 (1st Cir. 2002).

alleged violation."  Stamps v. Town of Framingham, 813 F.3d 27, 34 (1st Cir. 2016) (quoting Mlodzinski v. Lewis, 648 F.3d 24, 32 (1st Cir. 2011)).  The second prong, in turn, contains two subparts: "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable [official] would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable [official] would have understood that his conduct violated the right."  Id. (quoting Mlodzinski, 648 F.3d at 32–33).  Qualified immunity ultimately shields "all but the plainly incompetent or those who knowingly violate the law."  Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

We jump directly to the second prong[3] and ask whether Speaker Eves has met his burden to show that Governor LePage violated "clearly established" federal law.  See, e.g., Lopera v. Town of Coventry, 640 F.3d 388, 396 (1st Cir. 2011) (exercising the Pearson option and beginning with prong two).  In doing so, we heed the Supreme Court's oft-repeated warning "not to define clearly established law at a high level of generality."  E.g.,

---

[3]  In Pearson v. Callahan, the Supreme Court instructed lower courts "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. 223, 236 (2009).

- 14 -

Mullenix, 136 S. Ct. at 308; Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014); al-Kidd, 563 U.S. at 742; Stamps, 813 F.3d at 39. Although Speaker Eves need not produce "a case directly on point" to overcome Governor LePage's qualified immunity defense, "existing precedent must have placed the . . . constitutional question beyond debate." al-Kidd, 563 U.S. at 741.

B.    Analysis of Qualified Immunity Defense

The specific question we must consider is whether a reasonable governor objectively could have been uncertain about either the contours of the legal landscape or the constitutionality of this particular series of actions. See Stamps, 813 F.3d at 34. Speaker Eves bears the burden of proof, see Rivera-Corraliza v. Morales, 794 F.3d 208, 215, 219 (1st Cir. 2015), and he must place it beyond debate that Governor LePage unlawfully infringed upon the Speaker's First Amendment interests.

Speaker Eves has not done so. On these facts, a reasonable governor could have been uncertain whether the attempts to influence GWH would infringe upon the Speaker's constitutional rights -- even if the attempts were successful. No Supreme Court case or circuit case clearly forbade Governor LePage from informing a potential recipient of a government grant of his intention to exercise funding discretion, afforded him by the state legislature, if the potential recipient chose to persist with a course of action that the Governor disfavored. The decision that

actually affected the Speaker was made by third parties -- and private parties, at that. See Zaloga v. Borough of Moosic, No. 15-2723, 2016 WL 6156003, at *5 (3d Cir. Oct. 24, 2016) (affording qualified immunity to elected official, for lack of clearly established law, in part because "it has never been established that a governmental official who does not himself retaliate but instead pressures another individual to retaliate . . . can be held personally liable").

Speaker Eves articulates the alleged § 1983 violation as Governor LePage "us[ing] his control over public funds to coerce a private employer into firing the leader of the opposing political party in retaliation for that leader's exercise of First Amendment rights." At the highest level of generality, denying a governmental benefit "on a basis that infringes [a plaintiff's] constitutionally protected interests" amounts to a cognizable § 1983 claim. Perry v. Sindermann, 408 U.S. 593, 597 (1972).

In our view, however, Speaker Eves "cannot plausibly urge that [Governor LePage] had no valid . . . reason" for interfering with GWH's hiring decisions, in the specific context of this case. Wood v. Moss, 134 S. Ct. 2056, 2070 (2014). The qualified immunity test for government officials is objective, rather than subjective; we focus on what a reasonable governor could have believed, not on allegations about what Governor LePage actually believed. See Messerschmidt v. Millender, 132 S. Ct.

1235, 1245 (2012); Harlow v. Fitzgerald, 457 U.S. 800, 817–19 (1982) (holding that mere allegations of bad faith or pretext do not suffice without allegations of objectively and clearly wrongful conduct, and thereby abrogating Scheuer v. Rhodes, 416 U.S. 232 (1974)); Matalon v. Hynnes, 806 F.3d 627, 633 (1st Cir. 2015); Floyd v. Farrell, 765 F.2d 1, 4-6 (1st Cir. 1985). The Governor reasonably could have believed that his threats and criticisms pertained to subjects within his political ken and broad discretionary authority as governor, and that he was acting lawfully by criticizing and commenting upon GWH's plan to employ a president with a track record of opposition to Governor LePage's priorities with respect to education policy.

To avoid this conclusion, Speaker Eves must identify "existing precedent . . . [that] placed the statutory or constitutional question beyond debate." Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015) (per curiam) (quoting al-Kidd, 563 U.S. at 741). He cites several circuit cases and says that they put Governor LePage on notice that the Governor's communications with a third party -- that is, GWH -- violated the Speaker's rights. Of the cases the Speaker identifies, we discuss three, each of which involved a governor as defendant: Mihos v. Swift, 358 F.3d 91 (1st Cir. 2004); El Dia, Inc. v. Rossello, 165 F.3d 106 (1st Cir. 1999); and Blankenship v. Manchin, 471 F.3d 523 (4th Cir. 2006). None of the three placed it "beyond debate," in June 2015,

- 17 -

that the Governor's actions violated the Speaker's constitutional rights.

The decision in Mihos does not support denial of qualified immunity for at least two reasons. First, Mihos is factually dissimilar: the court denied pretrial qualified immunity to a governor who had directly terminated a plaintiff's appointment to a public-service position with a fixed term. In 1999, the Governor of Massachusetts, Paul Cellucci, reappointed plaintiff Christy Mihos to the Massachusetts Turnpike Authority, a "public instrumentality," for an eight-year term to expire in 2007. Mihos, 358 F.3d at 96. In 2001, Mihos and a colleague voted to delay an increase in Turnpike tolls beyond the date preferred by Cellucci's successor, Governor Swift. Id. at 96–97. Governor Swift responded by removing them from office, citing "the fiscal irresponsibility of their votes" on the toll increase. Id. at 97. The Mihos court "articulate[d] the First Amendment right at stake . . . as the right of a public official to vote on a matter of public concern . . . without suffering retaliation from the appointing authority for reasons unrelated to legitimate governmental interests," and found that the right was clearly established. Id. at 109.

Mihos's precise holding, however, was that "[n]o reasonable public official could have failed to realize that a member of a public instrumentality cannot be terminated on such

grounds for voting on matters of public concern within his authority." Id. at 110. Because Governor LePage did not directly terminate Speaker Eves's employment, but rather (taking the Speaker's allegations as true) used discretionary state funding as leverage to influence a private organization, Mihos did not indisputably put Governor LePage on notice that his particular conduct amounted to clearly unlawful retaliation in violation of the Speaker's constitutional rights.[4]

Even if Mihos were on all fours with this case, it would fail to undermine Governor LePage's qualified immunity defense for a second reason: the Governor could reasonably have concluded that Mihos's reasoning had been undermined by Garcetti v. Ceballos, 547 U.S. 410 (2006). Mihos applied the familiar Pickering test and weighed Mihos's First Amendment interests against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Mihos, 358 F.3d at 103 (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568

---

[4] The Speaker also cites Blankenship, which also involved threats of adverse regulatory action directly against the plaintiff. See Blankenship, 471 F.3d 523. The Fourth Circuit denied immunity at the 12(b)(6) stage to Joe Manchin III, then Governor of West Virginia, who had allegedly reacted to political criticism from plaintiff Blankenship by directing state regulators to apply "tougher scrutiny" to Blankenship's business affairs and work sites. Id. at 525–26. The case is distinguishable for that reason.

(1968)). But two years later, the Supreme Court squarely rejected "the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties." Garcetti, 547 U.S. at 426. That rejected notion is central to Mihos's reasoning.

Other courts, in granting qualified immunity, have observed that Garcetti has caused "substantial disagreement" among lower courts with respect to the scope of retaliation claims by public employees. Werkheiser v. Pocono Twp., 780 F.3d 172, 180 (3d Cir. 2015). The Third Circuit, for example, granted qualified immunity last year to two elected officials who were subjected to a retaliation lawsuit by a third elected official, plaintiff Werkheiser, after the defendants denied Werkheiser reappointment to a position in local government. Id. at 174-75. The court held that it was not clearly established whether elected officials -- like Werkheiser, or someone like Speaker Eves in the instant case -- are "public employees," nor what speech by elected officials should be categorized as "pursuant to their official duties." See id. at 177-81 (collecting cases and discussing "the unsettled nature of the law," after Garcetti, "amongst both the circuit courts and the district courts"). Because of the uncertainty in this doctrinal area in the wake of Garcetti, a reasonable official

in Governor LePage's position could also have viewed Mihos as a case of uncertain precedential value.[5]

In El Dia, the issue was whether the Governor of Puerto Rico, Pedro Rossello, was entitled to qualified immunity for his alleged termination of advertising contracts between government agencies and the plaintiff newspaper, which had "published a series of articles alleging patterns of fraud and waste in the Rossello Administration." 165 F.3d at 108. This court acknowledged that "[c]learly established law prohibits the government from conditioning the revocation of benefits on a basis that infringes constitutionally protected interests." Id. at 110 (citing Perry, 408 U.S. at 597). But in El Dia, "the very action in question ha[d] previously been held unlawful" by decisions in the Third and

---

[5]     We acknowledge that Garcetti addresses mostly free speech claims, as opposed to political affiliation or freedom of association claims. But Garcetti's concerns about the "delicate balancing" of public-employee rights and government flexibility, as well as its anxiety about "judicial intervention in the conduct of governmental operations," are not applicable only in the free speech context. 547 U.S. at 423. Those concerns, for example, also underlie the so-called policymaker exception: the principle that political affiliation, for certain public employees, is an "appropriate requirement for continued tenure." O'Connell, 724 F.3d at 126 (quoting Rosenberg v. City of Everett, 328 F.3d 12, 18 (1st Cir. 2003)); see also Maymí v. P.R. Ports Auth., 515 F.3d 20, 27 (1st Cir. 2008) (recognizing that both an official's political affiliation and her "substantive views on agency matters" are permissible justifications for firing or demotion when she occupies a policymaking role (citing Flynn v. City of Boston, 140 F.3d 42, 47 (1st Cir. 1998))).

Fifth Circuits.  Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  Although El Dia involved alleged retaliation by means of withholding discretionary benefits, and not by means of affirmative regulatory action, the case does not speak directly to the actions Governor LePage took and therefore did not put him on notice that his conduct was unlawful.  Even more importantly, El Dia involved intrusion by a governor into the operations of a newspaper and the freedom of the press -- factors not present here.[6]

By way of conclusion, we reiterate that we have no need to address the constitutionality vel non of Governor LePage's conduct.  We hold only that an official in the Governor's position reasonably could have been uncertain whether this particular series of actions, falling within broad discretion given by the

---

[6]    Speaker Eves cites several other decisions from our sister circuits.  Those cases also fail to render it beyond debate that Governor LePage's conduct violated the Speaker's First Amendment rights.  In the absence of "controlling authority" from the Supreme Court or this court, the Speaker's burden is to identify "a consensus of cases of persuasive authority" from our sister circuits.  Wilson v. Layne, 526 U.S. 603, 617 (1999); see also El Dia, 165 F.3d at 110 n.3 (recognizing that, "[a]mong other factors, the location and level of the precedent," as well as its age, are important factors in a qualified immunity analysis).  Speaker Eves has not met that burden: the out-of-circuit cases that are not factually distinguishable predate key Supreme Court precedent or are inconsistent with intervening precedent from our circuit.  Even collectively, these cases fall short of a "consensus."

legislature and pertaining to funds not yet formally appropriated, amounted to a violation of Speaker Eves's constitutional rights. Our holding is consistent with a long line of Supreme Court cases applying immunity as a shield for public officials who must exercise broad discretion in the discharge of their public duties. See, e.g., Mullenix, 136 S. Ct. at 310-12; Wood, 134 S. Ct. at 2067 (discussing broad discretion inherent to Secret Service roles); al-Kidd, 563 U.S. at 741–43 (affording qualified immunity to former U.S. Attorney General); Harlow, 457 U.S. at 815-19; Nixon v. Fitzgerald, 457 U.S. 731, 749-58 (1982) (affording absolute immunity to former U.S. President, as "a functionally mandated incident of the President's unique office").

III.

### Injunctive and Declaratory Relief

Speaker Eves seeks, in addition to damages, injunctive relief preventing Governor LePage from threatening GWH again or "using his authority" to interfere with the Speaker's employment in the private sector. Speaker Eves also seeks a declaratory judgment and an order compelling the Governor to complete "effective civil rights training." Qualified immunity, of course, cannot shield the Governor from these requests for equitable relief. See Battista v. Clarke, 645 F.3d 449, 452 (1st Cir. 2011).

The district court suggested that Speaker Eves's equitable claims are moot. Eves, 2016 WL 1948869, at *21. We

- 23 -

agree that the request for injunctive relief is moot insofar as it relates to ongoing interference with GWH. The Speaker conceded at oral argument, as a factual matter, that he has obtained a new private-sector job and that GWH has a new president. There appears to be "no ongoing conduct left for the court to enjoin." ACLU of Mass. v. U.S. Conference of Catholic Bishops, 705 F.3d 44, 53 (1st Cir. 2013).

As to Speaker Eves's other requests for prospective injunctive relief, the district court feared that the Speaker's desired injunction would have "extraordinary" breadth and would attempt to "compel [Governor LePage] to conform his behavior to some preferred standard of decorum." Eves, 2016 WL 1948869, at *22. We perceive the same problem, but it strikes us as sounding more in standing doctrine than in mootness. The Governor, as the party invoking mootness, bears a "formidable burden" in attempting to show that his "allegedly wrongful behavior could not reasonably be expected to recur." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 190 (2000). Even so, projected future harm can be "too speculative to support standing," even if it is "not too speculative to overcome mootness." Id.

Speaker Eves has not "credibly allege[d] . . . a realistic threat" of future retaliation from Governor LePage. Id. And the Supreme Court has been reluctant to afford private citizens standing to enjoin hypothetical future government conduct. See,

- 24 -

e.g., City of Los Angeles v. Lyons, 461 U.S. 95, 105-06, 110 (1983) (finding no standing for plaintiff seeking to enjoin police department's future use of choke holds, because he had failed to "indicate why [he] might be realistically threatened" by the use of such choke holds in the future). The Speaker's "subjective fears . . . are generic, speculative, and fail to demonstrate a 'real and immediate threat' of likely future violations." Asociación de Periodistas de P.R. v. Mueller, 680 F.3d 70, 85 (1st Cir. 2012) (quoting Lyons, 461 U.S. at 105).

There is another reason to affirm dismissal of these claims: Speaker Eves has not pleaded facts sufficient to prove his entitlement to an injunction. He has not demonstrated that any injury he has suffered was "irreparable," nor that "the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court," id., and the district court did not abuse its discretion in this instance.

IV.

**State Law Claim**

Speaker Eves also raises a pendent state claim under the Maine Tort Claims Act ("MTCA") for intentional interference with contract. Governor LePage argues that he is immune, as a matter of state law, because Maine grants absolute personal immunity to

- 25 -

"employees of governmental entities" for "[p]erforming or failing to perform any discretionary function or duty, whether or not the discretion is abused."  M.R.S.A. tit. 14, § 8111(1), (1)(C).

Having properly dismissed the § 1983 claims on which federal jurisdiction relied, the district court exercised supplemental jurisdiction and dismissed the pendent MTCA claim on immunity grounds.  In our view, the district court should have declined to exercise supplemental jurisdiction.

A district court "may decline to exercise supplemental jurisdiction" if the court "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  The Supreme Court has explained that district courts must weigh several factors when deciding whether to exercise jurisdiction over pendent state law claims: assuming jurisdiction might promote "judicial economy" and "convenience," but declining jurisdiction might promote "comity" or afford the parties a "surer-footed reading of applicable law" from state courts.  United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966).

Here, the balance of Gibbs factors tips heavily toward a federal court declining to exercise its supplemental jurisdiction.  Admittedly, the state law claim does not predominate in Speaker Eves's lawsuit, see id. at 727-28, and his claims all "derive from a common nucleus of operative fact," id. at 725.  Still, in this circuit, it is well settled "that in the

usual case in which all federal-law claims are eliminated before trial, the balance of factors [from Gibbs] will point toward declining to exercise jurisdiction over the remaining state-law claims." Rivera-Díaz v. Humana Ins. of P.R., Inc., 748 F.3d 387, 392 (1st Cir. 2014) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)). Most importantly, comity concerns loom especially large when a case broaches questions about the authority of a state's governor and the separation of powers within the state government. We take no position on whether the district court's interpretation of Maine law was correct; for the foregoing reasons, the matter is best left to the Maine courts.

To that end, the district court's dismissal of Speaker Eves's MTCA claim on the merits is vacated. We remand with instructions to dismiss the claim without prejudice.

V.

## Conclusion

The district court's judgment is affirmed with respect to the dismissal of Speaker Eves's federal claims, and vacated with respect to the dismissal with prejudice of Speaker Eves's MTCA claim, which is remanded to the district court for a dismissal without prejudice. No costs are awarded.

**-Dissenting Opinion Follows-**

- 27 -

**THOMPSON**, **Circuit Judge, dissenting.**

> Mark Eves is qualified to lead Good Will-Hinckley. This really goes beyond the political. This is personal and vindictive. I often disagree with Speaker Eves, but he's a fine and honest man. More importantly, he's a husband and a father of three beautiful kids who is trying to support his family. Political battles are one thing, but trying to ruin someone economically is quite another.
>
> > Roger Katz, a Maine Republican state senator[7]

Let what happened here sink in for a moment: As part of his 2015 scorched-earth campaign against Democrats, Republican Governor LePage threatened to put GWH — a century-old social-service organization for at-risk children — out of business by withholding over a cool mil in state funding unless GWH canned Democratic House Speaker Eves as its president. That's the story underlying Speaker Eves's complaint. And it's the one we must take as true given the pleading-stage nature of this controversy. See, e.g., Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012).

Anyway, zeroing in on the second prong of the qualified-immunity analysis (the clearly-established-right prong), my colleagues basically believe a governor back then could've reasonably thought it perfectly legal to do what Governor LePage did, because, they say, no prior case "forbade" the precise conduct

---

[7] A quote lifted from Speaker Eves's operative complaint.

that Speaker Eves complains of.  Take a second and reread the majority's holding (fyi, I've added bracketed letters for ease of reference):  arguing that [**a**] no case holds a government official liable for pressuring a "private" "third party" to retaliate against another, the majority writes that

> an official in the Governor's position reasonably could have been uncertain whether this particular series of actions, [**b**] falling within broad discretion given by the legislature and [**c**] pertaining to funds not yet formally appropriated, amounted to a violation of Speaker Eves's constitutional rights.

On top of that, my colleagues insist that [**d**] the Governor "reasonably could have believed . . . that he was acting lawfully by criticizing and commenting upon GWH's plan to employ a president with a track record of opposition to [his] priorities with respect to education policy."  Convinced that the majority's qualified-immunity analysis is off the mark, I write these words of protest.

The qualified-immunity defense hardly gives an official carte blanche to trash a citizen's constitutional rights simply because the fact pattern of the case doesn't precisely match the fact pattern of earlier cases.  See, e.g., Hope v. Pelzer, 536 U.S. 730, 739, 741 (2002) (explaining that "officials can still be on notice that their conduct violates established law even in novel factual circumstances," and adding that "[f]or a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is

- 29 -

doing violates that right'" (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987))); Marrero-Méndez v. Calixto-Rodríguez, 830 F.3d 38, 46 (1st Cir. 2016); Mlodzinski v. Lewis, 648 F.3d 24, 38 (1st Cir. 2011). That makes sense, because

> [t]he easiest cases don't even arise. There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability because no previous case had found liability in those circumstances.

K.H. Through Murphy v. Morgan, 914 F.2d 846, 851 (7th Cir. 1990) (Posner, J., for the court); accord Marrero-Méndez, 830 F.3d at 47 (holding that because the "coerciveness" of the official's actions is "patently" obvious, "no particular case — and certainly not one directly on point — need have existed to put a reasonable officer on notice of its unconstitutionality" (citation and quotations omitted)). What this means is that a plaintiff can meet his burden on the clearly-established front either by showing a prior case factually on all fours with the current one or by showing a violation so "obvious" that a reasonable person would've known about it, see Brosseau v. Haugen, 543 U.S. 194, 199 (2004) — note, please, that a violation fits the so-obvious category if "the relevant legal rights and obligations" were "particularized enough" that a sensible public servant could've "extrapolate[d] from them and conclude[d] that a certain course of conduct [would]

violate the law," see Savard v. Rhode Island, 338 F.3d 23, 28 (1st Cir. 2003) (en banc) (opinion of Selya, J.).

Viewed against this backdrop, my co-panelists' analysis doesn't persuade. Take first their comment — point [a] — that no case has ever put a public official on the liability hook for pressuring a private third-party entity to ax one of its employees. Undercutting their position is the fact that the very opinion they cite to support their position also says that "a public official" who took "some type of adverse action" impinging the plaintiff's First Amendment rights may be personally liable if he "'threaten[ed]' or 'coerce[d]' the third party to act." See Zaloga v. Borough of Moosic, No. 15-2723, 2016 WL 6156003, at *4 (3d Cir. Oct. 24, 2016) (quoting McLaughlin v. Watson, 271 F.3d 566, 573 (3d Cir. 2001)). And assessing the allegations through the required plaintiff-friendly prism, I have no trouble concluding that Governor LePage's bullying — forcing GWH to sack Speaker Eves on pain of losing more than a million bucks in expected state funding, knowing as he did that such a loss would likely kill GWH — is the type of coercion condemned by Zaloga.

As for the majority's talk about Governor LePage's funding discretion — point [b]: Does anyone think the Governor would or should get off scot-free if he had browbeat a state-funds-receiving entity into dumping an employee for religious, racial, or gender reasons? No way. Anyhow, a case on our books

- 31 -

long before the present fracas flatly contradicts Governor LePage's view — embraced by the majority — that the First Amendment doesn't apply to the mere withholding of discretionary state funding. See El Dia, Inc. v. Rossello, 165 F.3d 106 (1st Cir. 1999). An El Dia-run newspaper published a bunch of unflattering articles about Puerto Rico's then governor and his administration. Id. at 108. Retaliating, the governor and other officials had 18 government agencies stop advertising in the paper. Id. El Dia sued, alleging restriction of its First Amendment rights. Id. A district judge later granted the defendants' qualified-immunity-based motion to dismiss. Id. On appeal, the defendants persisted in arguing that no "'clearly established' First Amendment law" barred them from pulling gobs of discretionary "government advertising" from the paper as punishment for its knocking the administration. Id. But we would have none of it, saying in a ringing statement that "[i]t would seem *obvious* that using government funds" as a stick to punish First Amendment activity offends the Constitution because "[c]learly established law prohibits the government from conditioning the revocation of benefits on a basis that infringes constitutionally protected interests." Id. at 109-10 (emphasis added) (citing Perry v. Sindermann, 408 U.S. 593, 597 (1972)).

As I see it, a levelheaded governor could've extrapolated from El Dia that he couldn't withdraw discretionary

- 32 -

state funding to get back at a political opponent for exercising First Amendment rights.  The majority tries to deflect El Dia's impact by arguing that "El Dia involved intrusion by a governor into the operations of a newspaper and the freedom of the press — factors not present here."  But nothing in El Dia's money quote — that "[c]learly established law prohibits the government from conditioning the revocation of benefits on a basis that infringes constitutionally protected interests" — limits its reach to newspaper/freedom-of-the-press cases.  Rather, a fair reading of the words used there gave Governor LePage fair warning that his now-challenged actions would cross the constitutional line.

That leads us to my co-panelists' point [**c**] — that Governor LePage's actions related to "not yet formally appropriated" funds.  Well, they never explain why that matters.  Regardless, the complaint alleges the Governor understood that discretionary funds for GWH were "very likely to remain in the budget when it was enacted."  After all (to quote the complaint again), the $132,500 he had frozen "had already been submitted by" the department of education to the state controller's office "for payment" to GWH in the first quarter of the proposed budget — that the controller was getting ready to make this payment shows how everyone believed the money would be in the soon-to-be-enacted

budget.  And if more were needed, the Governor's threats certainly presupposed that GWH-related funds would stay in the budget.

And that leaves us with the majority's point [**d**] — that Governor LePage can get away with doing what he did because Speaker Eves opposed his education policy.  I see a big problem:  by accepting the Governor's response to Speaker Eves's political-affiliation-based allegations, they're not taking the complaint's well-pled allegations as true and reading them in the light most hospitable to the Speaker — which is a no-no.  See generally Wilson v. HSBC Mortg. Servs., Inc., 744 F.3d 1, 7 (1st Cir. 2014) (discussing the motion-to-dismiss protocol).

The bottom line: Clearly-established law didn't give Governor LePage the discretion to infract Speaker Eves's constitutional rights.  And because the majority — though conscientious — rules otherwise, I respectfully but emphatically *dissent*.